## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| LEO JENNINGS, | ) | CASE NO.    1:12CV3027 |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Leo Jennings ("Jennings") challenges the final decision of the Commissioner of Social Security, Carolyn Colvin[1] ("Commissioner"), denying his claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423 *et seq.* This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

### I. Procedural History

On April 29, 2009, Jennings filed an application for POD and DIB, alleging a disability onset date of April 14, 2009 and claiming he was disabled due to lymphoma. (Tr. 153, 157.) His application was denied both initially and upon reconsideration.

---

[1]Defendant indicates that Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013; and, that, pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. (Doc. No. 15 at 1.) Plaintiff does not object.

On February 3, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Jennings, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 9 - 44.)  On September 7, 2011, the ALJ found Jennings was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 50 - 56.)  The ALJ's decision became final when the Appeals Council denied further review.[2]  (Tr. 1-4.)

## II.  Evidence

### Personal and Vocational Evidence

Age forty-nine (49) at the time of his administrative hearing, Jennings is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c).  He has a high school education and past relevant work as a multi-screw machine operator, ironwork machine operator, and windshield installer.  (Tr. 37- 39, 55.)

### Hearing Testimony

At the February 3, 2011 hearing, Jennings testified to the following:

- He worked as a machinist, off and on, for twenty years.  At first, he worked on manual machines, lathes, and drill presses.  Later, he worked as a screw machine operator.  For this job, he was required to lift up to 100 lbs. several times per day. Between 1995 and 2001, he also worked part-time (i.e. two to three hours per week) as a windshield repairman. (Tr. 15-19.)

- In mid-February 2009, he began experiencing flu-like symptoms, including fever, night sweats, and the shakes. His symptoms followed a pattern of subsiding and then returning.  Eventually, he noticed an enlarged mass on his neck and went to the doctor.  His doctor prescribed antibiotics, ordered blood work, and ultimately referred him to an oncologist.  He was diagnosed with Hodgkin's lymphoma in May 2009.  (Tr. 19-22.)

- He underwent chemotherapy beginning in May 2009.  He had an allergic reaction to one of the chemotherapy drugs, which gave him terrible scars and blisters all over his body.  His last chemo treatment was on December 24, 2009.  A PET scan from August 2010 indicated that he was "stable." (Tr. 22-25.)

- Between February 2009 and December 2009, he was very weak and tired and his "whole body hurt." (Tr. 28.)  During this time period, he experienced violent, uncontrollable shaking and localized fevers; i.e. places on his body that felt unusually hot.  (Tr. 26-27.)  He tried to control the fevers by applying cold compresses for about an hour.  (Tr. 26-27.)  There was nothing he could do to control the shaking.  (Tr. 27.)  He also experienced swelling in his fingers that

---

[2] Jennings indicates that he subsequently filed a new application for disability benefits and was found to be disabled beginning March 2012.  (Doc. No. 14 at 2.)

2

                prevented him from bending them.  (Tr. 28.)

- After completing chemotherapy in December 2009, he continued to feel weak. He lost all his hair and was 25 lbs underweight.  He no longer experienced the shaking and fevers, but was just "not the same person physically" as he was prior to chemotherapy.  (Tr. 29.)

- Beginning in August 2010, he began to regain the weight he had lost.  However, he still experiences aches, sharp pains, and a lack of energy.  His feet feel swollen and it feels like he is "walking on needles."  He also experiences numbness in his hands, particularly when he uses the computer or drives.  (Tr. 30-32.)

During the hearing, counsel moved to amend Jennings' alleged onset date from April 14, 2009 to February 15, 2009, the date on which the flu-like symptoms began.  (Tr. 24.)  Counsel also stated Jennings was seeking a closed period of disability from February 15, 2009 to August 31, 2010, at which time he had a PET scan showing he was stable. (Tr. 24-25.)  Counsel noted that Jennings "still has symptoms of fatigue and peripheral neuropathy, shortness of breath, but it had gotten somewhat better and probably if somebody had offered him a desk job he could probably do it at this point in time." (Tr. 25.)

The VE then testified that Jennings had past relevant work as a "very highly skilled machinist." (Tr. 37.)  Specifically, he testified that he would classify Jennings' past relevant work as (1) multi-screw machine operator (medium, skilled); (2) multi-screw machine operator and set up (performed as heavy, skilled); (3) iron work machine operator (heavy, semi-skilled); and (4) windshield installer (medium, semiskilled).  (Tr. 37-39.)

The ALJ posed the following hypothetical:

> [A]ssume an individual of the claimant's same age, education and experience, and at the time of his alleged onset would be age 47, who can lift no more than 50 pounds occasionally, 25 pounds frequently; could only occasionally climb ramps and stairs, no ladders, ropes or scaffolding; only occasionally stooping; frequent gross manipulation; and for this first one, also frequent fine manipulation.

(Tr. 39.)  The VE testified such an individual could not perform Jennings' past relevant work as a multi-screw machine operator, but could perform his past relevant work as a windshield installer. (Tr. 39.)  The VE also testified such an individual could also perform "a lot" of other jobs.  (Tr. 39-40.)

The ALJ then posed a second hypothetical that incorporated the same limitations as the

3

first, but changed the handling and fine manipulation to occasional as opposed to frequent. (Tr. 40.) The VE testified such a hypothetical individual would not be capable of performing any of Jennings' past relevant work, but other jobs "might be feasible" such as cashier clerk (light, unskilled); laundry worker (medium, unskilled); and, order clerk (sedentary, unskilled). (Tr. 40.)

The ALJ posed a third hypothetical as follows: "if we reduced the exertional to lifting 20 pounds occasionally and 10 pounds frequently, with the stand and walk or sit six of eight hours with the normal breaks, the occasional ramps and stairs, no ladders, ropes or scaffolding, the occasional stoop and the occasional gross manipulation and fine manipulation, how would that effect the three jobs that you gave me?" (Tr. 41.) The VE testified that the laundry worker job would be eliminated, but that the cashier and order clerk jobs would remain. (Tr. 41.)

As a fourth hypothetical, the ALJ asked "if everything was the same as number three at the light, the occasional ramps and stairs, no ladders, ropes or scaffolding, occasional stoop, occasional gross and fine manipulation, but the feeling was dropped to occasional, would that . . . exclude either the cashier or order clerk jobs?" (Tr. 41.) The VE testified that the cashier and order clerk jobs would not be affected. (Tr. 41.)

Finally, the ALJ asked whether the hypothetical individual would be able to maintain either the laundry worker, cashier, or order clerk jobs if he would need to take one additional break during the day for as long as an hour to be able to take care of personal needs. (Tr. 41.) The VE testified such a hypothetical individual would not be able to maintain any of those three jobs absent a special accommodation. (Tr. 42.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Jennings was insured on his alleged disability onset date, April 14, 2009, and remained insured through December 31, 2013. (Tr. 50.) Therefore, in order to be entitled to POD and DIB, Jennings must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.  Summary of Commissioner's Decision

The ALJ found Jennings established a medically determinable, severe impairment, due to chemotherapy resultant neuropathy; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 52- 53.) Jennings was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of medium work. (Tr. 53- 55.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Jennings was not disabled. (Tr. 55-56.)

---

[3] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

6

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

Jennings claims the ALJ erred when she: (1) denied his motion to amend his onset date; (2) failed to find his lymphoma was a severe impairment; (3) failed to consider peripheral neuropathy of his feet in the Residual Functional Capacity ("RFC") assessment; and (4) found he was capable of performing a significant number of jobs in the national economy.

### *Denial of Motion to Amend Onset Date*

Jennings first argues the ALJ unreasonably denied his motion to amend his onset date from April 14, 2009 to February 15, 2009.  Noting an ALJ should consider a claimant's allegations, work history, and the medical evidence in determining the appropriate onset date, Jennings maintains both his hearing testimony and the medical evidence confirm that he began experiencing flu-like symptoms at the time of his amended onset date; i.e. mid-February 2009.  In addition, Jennings argues the ALJ incorrectly found that he worked after the April 2009 onset date as a windshield repairman.  He maintains he discontinued his windshield repair work in 2001, and "there is no evidence to support the ALJ's finding that Jennings engaged in any type of work activity after his amended onset date of February 15, 2009."  (Doc. No. 14 at 9.)

The Commissioner argues the ALJ reasonably declined to amend Jennings' onset date because "there were no medical records prior to April 2009." (Doc. No. 15 at 10.)  She further notes Jennings collected unemployment earnings in the first quarter of 2009 and argues this is "fundamentally inconsistent with a claim of disability."  (Doc. No. 15 at 10.)

7

Social Security regulations place the burden on a claimant to prove the existence of a disability.  *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).  However, '[o]nce a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833-34 (6th Cir. 2006).  In determining the onset date, an ALJ must follow Social Security Ruling ("SSR") 83-20 but need not refer to it directly.  *Id*. at 834.  This Ruling provides, in relevant part, as follows:

> Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence.  These factors are often evaluated together to arrive at the onset date.  However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence.

SSR 83-20, 1983 WL 31249 at * 1.  Further, the Ruling emphasizes that, while "the starting point in determining the date of disability is the individual's statement as to when disability began," the medical evidence "serves as the primary element in the onset determination."  *Id*. at * 2.  In the case of slowly progressive impairments, "it is not necessary for an impairment to have reached listing severity."  *Id*.  However, "the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record."  *Id*.

Here, Jennings acknowledges that he alleged an onset date of April 14, 2009 in his disability application.  (Doc. No. 14 at 8; Tr. 120.)  During the hearing, however, his counsel moved to amend the onset date to February 15, 2009, claiming "that was the date that he first started experiencing these flu-like symptoms, which pretty much knocked him out." (Tr. 24.)  The ALJ took  Jennings' motion under advisement during the hearing, but expressly denied it in the decision.  (Tr. 50.)  Therein, the ALJ discussed Jennings' hearing testimony and then recounted the medical evidence as follows:

> The claimant initially presented to Metro Health Medical Center on April 14, 2009, complaining of a neck mass, fever, and chills.  The claimant reported that he initially felt flu-like symptoms beginning approximately 2 ½ months prior. He first experienced the neck mass approximately two months prior to this visit. (Ex. 2F, p. 4).  The claimant underwent a biopsy, which revealed malignant lymphoma.  (Ex. 2F, p. 35).  The claimant received a course of eight chemotherapy treatments between May 15, 2009, and December 24, 2009. (Ex. 10F, p. 1).
>
> According to a December 23, 2009, office visit with Dr. Sidolski, the claimant

demonstrated no palpable adenopathy. Dr. Sidolski indicated that the claimant
was clinically stable. (Ex. 10F, p. 16).

(Tr. 54.) The ALJ also noted that, while Jennings indicated he initially experienced symptoms in

February 2009, "[t]he evidentiary record does not establish that the claimant sought medical care

prior to March of 2009. (Ex. 1F). The claimant's symptoms had mostly resolved by December of

2009, with the exception of pain from his neuropathy." (Tr. 52-53.)

The ALJ did not err in denying Jennings' motion to amend his onset date. Viewing the

decision as a whole, the Court finds the ALJ properly considered Jennings' hearing testimony and

the medical evidence regarding his lymphoma, as required by SSR 83-20. The decision

acknowledged Jennings' claim that he began experiencing flu-like symptoms in February 2009,

but noted the absence of any evidence that Jennings sought medical treatment at that time.

Jennings does not refute this finding, nor does he direct this Court's attention to any contradictory

medical records.

Jennings is correct that the ALJ mistakenly found he engaged in windshield repair and

paint-touch up work after April 14, 2009. (Tr. 52.) Jennings clearly testified that he discontinued

his part-time windshield repair work in 2001. (Tr. 18-19.) However, the ALJ made this factual

finding in the context of determining whether Jennings had engaged in substantial gainful activity

since his onset date.[4] There is no indication the ALJ refused to allow Jennings to amend his onset

date because of her mistaken impression that Jennings worked after April 2009. Considered in

this context, the Court considers the ALJ's finding that Jennings engaged in part-time windshield

repair work after April 2009 to be harmless error.

As provided in SSR 83-20, "the medical evidence serves as the primary element in the

onset determination." SSR 83-20, 1983 WL 31249 at * 2. The ALJ properly considered the

medical evidence in this case and correctly found there to be no medical records indicating

Jennings sought treatment prior to March 2009. Although Jennings points to references in

---

[4] The ALJ concluded that Jennings' windshield repair work did not constitute substantial
gainful activity because Jennings worked only two to three hours per week, earning $200 per
month. (Tr. 52.)

subsequent treatment notes to support his argument of a February 2009 onset date, the ALJ "need

not disprove a possible earlier onset date, even if [it] is supported by substantial evidence, as long

as the onset date determined by an [ALJ] is supported by substantial evidence." *Shrader v. Astrue*,

2012 WL 5383120 at * 5 (E.D. Mich. Nov. 1, 2012).  *See also Besaw v. Sec'y of Health & Human

Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992).  Here, it is undisputed that Jennings reported to Metro

Health Center with an enlarged neck mass, fever and chills on April 14, 2009, and shortly

thereafter was diagnosed with Hodgkin's lymphoma.  (Tr. 198-238.)  Indeed, Jennings himself

initially identified his onset date as April 14, 2009 in his disability application.  (Tr. 120, 153.)

In light of this evidence, the ALJ's determination that Jennings' onset date was April 14,

2009 (as opposed to February 15, 2009) is supported by substantial evidence.  Jennings' first

assignment of error is without merit.

### Finding of Non-Severe Impairment

Jennings next argues the ALJ erred when she failed to find that his Hodgkin's lymphoma

constituted a "severe" impairment.  He maintains his lymphoma is related to his chemotherapy-

resultant neuropathy and, therefore, the ALJ should have jointly considered his symptoms from

these impairments to find that he met the twelve month duration requirement set forth in 40

C.F.R. § 404.1509.[5] (Doc. No. 14 at 10.)

The Commissioner argues the ALJ's non-severity finding is supported by substantial

evidence and, further, that any error in this finding is harmless in light of the fact that the ALJ

considered both Jennings' lymphoma and his chemotherapy resultant neuropathy during

subsequent steps of the disability analysis.  (Doc. No. 15 at 8-9.)

At step two of the disability analysis, the ALJ must determine whether the claimant has a

severe impairment.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  To determine if a claimant has a severe

impairment, the ALJ must find that an impairment, or combination of impairments, significantly

limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. §

---

[5]  40 C.F.R. § 404.1509 provides that "[u]nless your impairment is expected to result in
death, it must have lasted or must be expected to last for a continuous period of at least 12
months.  We call this the duration requirement."

404.1520(c).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) "[u]nderstanding, carrying out, and remembering simple instructions; (4)[u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers, and usual work situations; and (6)[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1.  After the ALJ makes a finding of severity as to even one impairment, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184, at *5.  When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the ALJ's failure to find additional severe impairments at step two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009); *Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).

Here, at step two, the ALJ concluded that Jennings' chemotherapy resultant neuropathy constituted a "severe" impairment.  (Tr. 52.)  She then found his Hodgkin's lymphoma was not "severe," explaining as follows:

> The claimant received a diagnosis of Hodgkin's lymphoma in April of 2009.  (Ex. 2F, p. 35).  The claimant indicated that he initially experienced symptoms in February of 2009. (Ex. 2, p. 4).  The evidentiary record does not establish that the claimant sought medical care prior to March of 2009 (Ex. 1F).  The claimant's symptoms had mostly resolved by December of 2009, with the exception of pain from his neuropathy.  (Ex. 10F, p. 16).  Therefore, this impairment is not severe in accordance with 20 C.F.R. § 404.1520(c) because the claimant did not suffer continuous symptoms for a period of twelve months or more.

(Tr. 52-53.)  Later in the decision, the ALJ cited the opinions of two state agency physicians as a

11

further basis for finding Jennings' lymphoma to be non-severe:

> Eli Perencevich, D.O., reviewed the evidence of record on behalf of the State agency, submitting a medical evaluation on November 18, 2009.  Dr. Perencevich indicated that the claimant has a history of Hodgkin's lymphoma. The claimant responded well to chemotherapy.  Dr. Perencevich indicated that the claimant's allegations of fatigue from chemotherapy are credible, but the severity of the symptoms should not last. (Ex. 8F).  Anton Freihofner, M.D., also reviewed the evidence of record on behalf of the State agency, submitting a medical evaluation on January 15, 2010.  Dr. Freihofner indicated that the claimant has not experienced a worsening of symptoms or level of functioning. The claimant continued to improve with treatment, and his impairment is not disabling. Dr. Freihofner did not expect his impairment to last 12 months.  (Ex. 9F).  I give significant weight to the State agency opinions, finding that they are consistent with the evidence of record in establishing that the Hodgkin's lymphoma is not a severe impairment.

(Tr. 55-55.)[6]

The ALJ bases her step two finding regarding Jennings' lymphoma, at least in part, on her finding that Jennings did not suffer symptoms directly relating to that condition for a continuous period of twelve months.  Even assuming the ALJ's reasoning on this issue was erroneous,[7]  the Court finds no reversible error.  As set forth below, the ALJ's consideration of the cumulative effect of Jennings' impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any such error harmless.  *Maziarz*, 837 F.2d at 244.

At the third step of the analysis, the ALJ expressly considered whether Jennings met the listing for lymphoma (Listing 13.05) and concluded he did not because his lymphoma was determined to be "clinically stable within 12 months of beginning chemotherapy." (Tr. 53.)  At

---

[6] Jennings does not object to the ALJ's characterization of these state agency opinions, or the weight she ascribed to them.

[7] This Court recently rejected this interpretation of the regulations in *Coulter v. Astrue*, 2012 WL 5463858 at * 9 (N.D. Ohio Nov. 8, 2012) (White, J.).  In that case, the ALJ "appear[ed] to believe that an impairment which does not last twelve months is necessarily 'non-severe.'"  *Id.*  The Court noted that "[t]hough not addressing the issue squarely, 20 C.F.R. § 404.1522(a) states as follows: '[i]f you have a severe impairment(s) and then develop another severe impairment(s) but neither one is expected to last for 12 months, we cannot find you disabled, even though the two impairments in combination last for 12 months."  *Id.*  Interpreting this regulation, the Court held that "[b]y inference from the regulation, **an impairment need not last twelve months to be 'severe' within the meaning of the regulations**."  *Id.* (emphasis added).

12

step four, the ALJ thoroughly discussed Jennings' hearing testimony and the medical and opinion evidence regarding both his lymphoma and neuropathy in formulating the Residual Functional Capacity ("RFC").  (Tr. 53- 54.)  While Jennings complains the RFC failed to include sufficient limitations to accommodate his neuropathy (discussed at greater length *infra*), he does not argue that it insufficiently accommodated any particular limitations resulting from his lymphoma.  Indeed, Jennings does not direct this Court's attention to any medical or opinion evidence suggesting he has any greater limitations relating to his lymphoma than those identified by the ALJ and incorporated into the RFC.[8]  Finally, at step five, the ALJ presented a hypothetical question to the VE which included the limitations set forth in the eventual RFC.  While the VE testified that such an individual could not perform Jennings' past relevant work, he stated that other jobs would be available at both the sedentary, light, and medium unskilled levels.

Accordingly, because the ALJ properly considered Jennings' lymphoma in the remaining steps of the sequential analysis, any error in failing to find that his lymphoma constituted a severe impairment does not rise to the level of reversible error.  *See Maziarz*, 837 F.2d at 244 ("Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error"); *Anthony*, 2008 WL 508008 at * 5 (because the ALJ considered claimant's severe and nonsevere impairments at the remaining steps of the sequential analysis, "[t]he fact that some of Anthony's impairments were not deemed to be severe at step two is therefore legally irrelevant").

Jennings' second assignment of error is without merit.

### RFC Assessment

In his third assignment of error, Jennings argues the ALJ erred when she failed to accommodate limitations resulting from his foot neuropathy in the RFC.  He argues both his

---

[8]  Jennings does not direct this Court's attention to any documents indicating his treating oncologist, Jay Sidolski, D.O., assessed any particular physical restrictions related to either his lymphoma or his neuropathy.

hearing testimony and the medical record establish that he experiences moderately disabling, chronic foot pain.  Jennings maintains the ALJ "did not have any reason for discounting" this evidence and the RFC is not supported by substantial evidence because it fails to address limitations in his ability to stand and walk throughout an eight hour day.  (Doc. No. 14 at 11-12.)

The Commissioner argues that "all of the probative medical and opinion evidence" supports the ALJ's finding that Jennings could perform a modified range of medium work, noting that treatment notes from May and August 2010 indicate Jennings' foot neuropathy had improved.  Accordingly, the Commissioner maintains the RFC is supported by substantial evidence.  (Doc. No. 15 at 10-11.)

A claimant's RFC is the most that he can still do despite his functional limitations.  20 C.F.R. § 404.154(a); SSR 96-8p.  The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions.  20 C.F.R. § 404.1546(c).  The final responsibility for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. § 404.1527(e)(2).  While this Court reviews the entire administrative record, it "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  Indeed, the Sixth Circuit has repeatedly upheld ALJ decisions where medical opinion testimony was rejected and the RFC was determined based upon objective medical and non-medical evidence.  *See e.g., Ford v. Comm'r of Soc. Sec.*, 2004 WL 2567650 (6th Cir. Nov. 10, 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 (6th Cir. Aug. 18, 2009).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 2009 WL 2514058 at * 7.

Here, the ALJ thoroughly discussed the medical evidence regarding Jennings' neuropathy.  She noted that, after completing his course of eight chemotherapy treatments in December 2009,

14

Jennings reported "continuing pain from neuropathy."[9]  (Tr. 54.)  The decision referenced treatment notes from February 2010 which describe Jennings as experiencing "moderately disabling" foot discomfort.  (Tr. Tr. 54, 335.)  However, the ALJ emphasized Dr. Sidolski's finding that, as of May 2010, Jennings' neuropathy had improved.  (Tr. 54, 331-332.)  The ALJ also referred to subsequent treatment notes from August 2010, indicating Jennings' neuropathy was "moderately disabling" but "slowly better" since completion of his chemotherapy.  (Tr. 54, 326-327.)  The ALJ then discussed Dr. Sidolski's treatment notes from February 2011, which describe Jennings' foot peripheral neuropathy as "moderately disabling" and note "no change" since his last visit.  (Tr. 54, 350.)  Finally, the ALJ noted Jennings' hearing testimony that he "experiences tingling in the bottom of his feet." (Tr. 54.)  The ALJ formulated Jennings' RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of medium work as defined in 20 C.F.R. § 404.1567(c) frequently except that he can only occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, occasionally stoop, and occasionally perform fine and gross manipulation tasks with his hands.

(Tr. 53.)

The Court rejects Jennings' argument that the RFC failed to properly account for peripheral neuropathy of his feet.  The ALJ acknowledged Dr. Sidolski's characterization of Jennings' neuropathy as "moderately disabling," but expressly noted Jennings' reports of gradual improvement once his chemotherapy had concluded.  (Tr. 54.)  Moreover, while Jennings argues generally that the RFC "does not address limitations in [his] ability to stand and walk throughout an eight hour day" (Doc. No. 14 at 12), he does not point to any evidence in the record suggesting what those limitations might be.  Notably, he does not direct this Court's attention to any physician opinion evidence suggesting he has functional limitations relating to his peripheral neuropathy that are greater than those set forth in the RFC.  Further, while he testified during the

---

[9]  According to Dr. Sidolski's treatment notes, Jennings first reported mild foot discomfort in November 2009.  (Tr. 321.)  Jennings continued to report mild foot pain throughout December 2009, which Dr. Sidolski indicated "[might] be early peripheral neuropathy from Velban." (Tr. 341 -343, 338- 340.)  In February 2010, Dr. Sidolski began characterizing Jennings' foot pain as "moderately disabling."  (Tr. 335.)

hearing that his feet feel swollen and "like I'm walking on needles," he did not testify that he is limited in his ability to stand or walk for a total of approximately six hours over the course of an eight hour workday, as required for "medium work."[10]

In the absence of any such evidence, and in light of references in the treatment notes to gradual improvement in Jennings' foot pain, the Court finds the RFC reasonably accounts for his peripheral foot neuropathy and is supported by substantial evidence. Accordingly, Jennings' third assignment of error is without merit.

### Step Five Determination

Finally, Jennings argues the ALJ unreasonably relied upon the VE's testimony to find that he is capable of performing a significant number of jobs in the national economy. He maintains the VE was equivocal when he testified that a hypothetical individual limited to occasional gross and fine manipulation could not perform any of Jennings' past relevant work but that "some other jobs **might** be feasible." (Tr. 40) (emphasis added). When further questioned by counsel about the occasional gross and fine manipulation limitation, Jennings claims the VE provided inconclusive testimony suggesting a "possible conflict" with the Dictionary of Occupational Titles ("DOT"). Because the ALJ failed to clarify this alleged confusion, Jennings maintains the ALJ's step five determination is not supported by substantial evidence. (Doc. No. 14 at 13.)

The Commissioner argues the VE's testimony supports the ALJ's decision. She maintains the VE clearly testified that a hypothetical individual limited to occasional fine and gross manipulation could, in fact, perform work as a laundry worker, cashier/clerk, and order clerk. The Commissioner further emphasizes that the VE expressly affirmed his testimony was consistent with the DOT and based on his knowledge, education, and experience. (Doc. No. 15 at 12-13.)

Once it is determined that a claimant does not have the RFC to perform his past relevant work, the burden shifts to the Commissioner at step five of the disability sequential evaluation

---

[10] As set forth in SSR 83-10, "medium work" requires "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday" with sitting occurring "intermittently during the remaining time." SSR 83-10, 1983 WL 31251 at * 5.

16

process to show that the claimant possesses the capacity to perform other substantial gainful activity which exists in the national economy. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *Anthony v. Astrue*, 266 F. App'x 451, 460 (6th Cir. 2008) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 148 (6th Cir. 1990)). "To meet this burden, there must be a finding supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). The testimony of a vocational expert in response to a hypothetical question may serve as substantial evidence of a claimant's vocational qualifications to perform certain jobs. *Id.* However, the hypothetical question must accurately portray the claimant's physical and mental state. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir.1993)); *Varley*, 820 F.2d at 779. Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994). If a VE testifies in response to a hypothetical question that sets forth all of the claimant's impairments, his response constitutes substantial evidence for a finding of either disability or nondisability. *See Maziarz*, 837 F.2d at 247.

Here, the ALJ's second hypothetical asked the VE to assume an individual of Jennings' age, education, and experience who can lift no more than 50 pounds occasionally and 25 pounds frequently; only occasionally climb ramps and stairs but no ladders, ropes, or scaffolding; only occasionally stoop; and only occasionally perform gross and fine manipulation. (Tr. 40.) The VE testified that such a hypothetical individual would not be capable of performing any of Jennings' past relevant work, but that "other jobs might be feasible," including cashier clerk, laundry worker, and order clerk. (Tr. 40.)

17

Jennings' counsel later asked the VE to clarify his interpretation of the ALJ's limitation that the hypothetical individual could only occasionally use his hands throughout the day.  (Tr. 42.)  The VE answered as follows:

> A:      I interpreted it a total use of either hand, either the right hand or the left hand being done only occasionally.  In other words, oh, for example– for example, me here writing notes. Okay? I'm not taking notes the whole time I'm here. I'm probably taking notes less than occasionally, even though my job, my full attention needs to be able to take notes at anytime throughout an eight-hour day.  But I'm only actually doing it less than a third of the time.  So that's how I applied that.
>
> Q:      Okay. So you're saying that these jobs can be performed, like a clerk, if they're only using their hands for one-third of the time?
>
> A:      For the numbers– for the jobs that I gave and for the numbers I gave, yes.
>
> Q:      What if it was a busy day and they said, well, I've used my hands for a third of the time, I can't do it anymore.
>
> A:      That would be unacceptable.  That would not work.
>
> Q:      Okay. And so that could happen in the job, in a clerk job?
>
> A:      Yeah.
>
> Q:      What about– I mean, so for all these jobs, it could happen that they would be required to use their hands for more than a third of the day?
>
> A:      I think that's a possibility, yes.
>
> ATTY:          Thank you. I have no other questions.

(Tr. 42-43.)

Jennings argues that, read as a whole, the VE's testimony regarding occasional gross and fine manipulation is inconclusive and represents a "possible conflict" with the DOT.  The Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if the evidence that he has provided conflicts with information contained in the DOT.  *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009).  Specifically, SSR 00-4p provides as follows:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

18

Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict.  The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00-4p, 2000 WL 1898704 at * 2 (Dec. 4, 2000).  Interpreting the above, the Sixth Circuit has made clear that an ALJ "is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p."  *Beinlich v. Comm'r of Soc. Sec.*, 2009 WL 2877930 at * 4 (6th Cir. Sept. 9, 2009).  *See also Lindsley*, 560 F.3d at 606; *Martin v. Comm'r of Soc. Sec.,* 2006 WL 509393 at * 5 (6th Cir. March 1, 2006) ("Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct").

The Court finds the ALJ did not unreasonably rely on the VE's testimony.  Prior to posing any hypothetical questions, the ALJ expressly asked the VE:  "will your testimony be based on your knowledge, education, experience and [be] consistent with the DOT and its companions?" (Tr. 37.)  The VE testified that it would.  (Tr. 37.)  As part of her second hypothetical question, the ALJ then asked the VE whether jobs would be available for a hypothetical claimant limited to occasional, "as opposed to frequent,"[11] gross and fine manipulation.  (Tr. 40.)  The VE identified three jobs that met this limitation (i.e. cashier clerk, laundry worker, and order clerk) and, for each job, provided its corresponding DOT number and classification as either sedentary, light, medium, skilled or unskilled.  (Tr. 40-41.)  For each of these three jobs, the VE also provided the number of jobs available both regionally and nationally.[12]  (Tr. 40.)

---

[11]  The term "occasionally" means "occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251 at * 5 (1983).  "Frequently" means "occurring from one-third to two-thirds of the time."  *Id*. at * 6.

[12]  The VE testified the cashier clerk job was DOT number 211.462-010 and identified this position as light, unskilled, with 1500 jobs in northeast Ohio and 280,000 jobs nationally. (Tr. 40.)  He testified the laundry worker job was DOT 361.687-018 and identified it as medium, unskilled, with 700 jobs in northeast Ohio and 95,000 jobs nationally.  (Tr. 40.)  Finally, the VE testified the order clerk job was DOT number 209.567-014 and identified it as sedentary, unskilled, with 300 jobs in northeast Ohio and 40,000 jobs nationally. (Tr. 40-41.)  Jennings does

19

When Jennings' attorney asked whether a hypothetical individual could perform these three jobs by an individual "only using their hands for one-third of the time," the VE expressly replied in the affirmative "**for the jobs that I gave and the numbers I gave**." (Tr. 42) (emphasis added).  While the VE later suggested the possibility that there might be days when such an individual performing these jobs could potentially be asked to use their hands for more than a third of the day, the Court finds this testimony is insufficient to demonstrate a conflict with the DOT.  The VE clearly explained that, for the jobs and in the numbers he provided, the hypothetical individual could perform the three identified jobs with the limitation of only occasional fine and gross manipulation.  (Tr. 42.)  Indeed, the VE's testimony on this point was in the express context of distinguishing between hypothetical questions involving the occasional "as opposed to frequent" (Tr. 40) need to perform fine and gross manipulation.[13]  It stands to reason that, had the VE believed there was a significant possibility that the identified jobs would require the hypothetical individual to use his hands more than one-third of the time (i.e. frequently), he would not have identified them in direct response to a hypothetical limiting the individual to occasional gross and fine manipulation.

In light of the above, the Court finds the ALJ did not unreasonably rely on the VE's testimony, nor did she fail to follow the requirements of SSR 00-4p.  The ALJ's step five determination was, therefore, supported by substantial evidence.  Accordingly, Jennings' fourth assignment of error is without merit.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by

---

not raise any objection to this testimony.

[13]  The Court further notes that, while the ALJ generously included this limitation in the RFC, Jennings points to no medical or opinion evidence suggesting the presence of any functional limitations relating to peripheral neuropathy of his hands.  Moreover, Jennings touched only briefly on the subject of his hands during the hearing, stating only that he experiences "numbness in my hands sometimes," particularly when using the computer or driving. (Tr. 31-32.)

substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED.


s/ Greg White_____
United States Magistrate Judge

Date: September 17, 2013


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**